**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

NEAL PARKER, *et. al*,               :
                                     :
       Plaintiffs,                   :
                                     :
v.                                   :   CIVIL ACTION NO.
                                     :   1:04-CV-606-RWS
BRUSH WELLMAN, INC., *et. al*        :
                                     :
       Defendants.                   :
_____:_____
TIMOTHY P. BERUBE, *et. al*,         :
                                     :
       Plaintiffs,                   :   CIVIL ACTION NO.
                                     :   1:08-CV-2725-RWS
v.                                   :
                                     :
BRUSH WELLMAN, INC., *et. al*        :
                                     :
       Defendants.                   :

**<u>ORDER</u>**

These cases come before the Court on various motions.  The following

Motions are presently before the Court: Defendants' Motions for Summary

Judgment (Civil Action No. 1:04-CV-606-RWS [345, 346, 347, 356, & 360]

and Civil Action No. 1:08-CV-2725-RWS [147,148, 149, 156, & 159]);

Defendant McCann's Motion for Leave to File Excess Pages (Civil Action No.

AO 72A
(Rev.8/82)

1:08-CV-2725-RWS [160]); Defendants' Motions to Exclude Testimony (Civil Action No. 1:04-CV-606-RWS [352, 358] and Civil Action No. 1:08-CV-2725-RWS [153, 161]); Plaintiffs' Amended Motion to Compel Production of Documents from Lockheed Martin (Civil Action No. 1:04-CV-606-RWS [314]); and Plaintiffs' Motion to Compel Production of Documents by McCann (Civil Action No. 1:04-CV-606-RWS [319] and Civil Action No. 1:08-CV-2725-RWS [125]).  After a review of the record and a hearing on the motions on September 2, 2010, the Court enters the following Order.

## I.   Factual Background[1]

The above-captioned *Parker* Civil Action No. 1:04-CV-606-RWS and *Berube* Civil Action No. 1:08-CV-2725-RWS cases are separate cases that have been consolidated for pretrial discovery purposes.  The *Parker* case involves four Plaintiffs—Neal Parker, Ralph Griffin, Wilbert Carlton, and Carl Brown—and the *Berube* case involves eight Plaintiffs—Tim Berube, Stephen King, George King, John Vaniman, John Gamble, Ernest Dunton, Matthew Bell, and Milton Moss.  The Plaintiffs are current or former employees of

---

[1]These facts are drawn primarily from the Complaint and the Parties' Statements of Undisputed Material Facts unless otherwise noted.

AO 72A
(Rev.8/82)

Lockheed Martin Corporation ("Lockheed") at its Marietta, Georgia plant site, and the Plaintiffs have had a variety of job responsibilities, time periods of employment, and work areas at the Lockheed facility.  The Plaintiffs allege that they were exposed to beryllium while employed by Lockheed and working on and/or around the C-130, C-5, and F/A-22 aircraft.

In the original complaint in the *Parker* case, the Plaintiffs named eight defendants— Lockheed, Brush Wellman Inc. ("Brush Wellman"), Schmiede Corporation ("Schmiede"), Thyssenkrupp Materials NA, Inc. d/b/a Copper and Brass Sales ("ThyssenKrupp"), Axsys Technologies, Inc. ("Axsys"), Alcoa Inc. ("Alcoa"), McCann Aerospace Machining Corporation ("McCann"), and Cobb Tool, Inc. ("Cobb Tool"). (Civil Action No. 1:04-CV-606-RWS [1]). Axsys, Lockheed, and Cobb Tool were dismissed from the *Parker* case (Civil Action No. 1:04-CV-606-RWS [90, 95, and 120]) and not named as defendants in the *Berube* case, and Brush Wellman was dismissed from the *Parker* and *Berube* cases after entering into a confidential settlement agreement with Plaintiffs. (Civil Action No. 1:04-CV-606-RWS [318] and Civil Action No. 1:08-CV-2725-RWS [124]).  Four defendants—Schmiede, McCann, ThyssenKrupp, and Alcoa—remain.

AO 72A
(Rev.8/82)

A. Lockheed's Marietta Facility

Lockheed's Marietta Facility was purchased by the U.S. Government in 1942 and is leased and operated by Lockheed.  Since 1952, Lockheed has produced the beryllium-containing C-130 Hercules airlifter, the C-5 Galaxy, the C-141 Satrlifter, and the F/A-22 Raptor Air Dominance Fighter at its Marietta location. (Civil Action No. 1:04-CV-606-RWS [64] at 3-4).  The United States Air Force "requires [beryllium parts in these aircraft] for safety reasons or for maintainability reasons that may implicate national security issues." Id. at Tab G, Decl. Anthony L. Green.

As a part of this beryllium-aircraft production, Lockheed has used the Department of Defense "Handbook for Metallic Metals and Elements of Aerospace Vehicle Structures" since 1966 as a standard reference guide.  And in 1983, Lockheed issued its proprietary "Safety and Industrial Hygiene Standard No. 3.5" which recognized that actions such as machining and grinding create beryllium dust and vapors which ultimately cause  respiratory problems.   (Civil Action No. 1:04-CV-606-RWS [346], Ex. 3). This report also noted that all those who work around beryllium need to have medical monitoring.  Id.  Even before using beryllium on the F/A-22, Lockheed and the

4

U.S. Government performed a risk analysis and decided to implement beryllium parts based upon "the best professional judgment with the information available at the time." (Civil Action No. 1:04-CV-606-RWS [64] Ex. C, para. 6).

As a part of its normal practice, Lockheed issues beryllium warnings to any employee who works on beryllium-producing tasks via work orders. (Civil Action No. 1:04-CV-606-RWS [392] Ex. 1at 24:13-25:1). In fact, Lockheed requires its health and safety department to sign off before any work involving beryllium copper can be done. Over the past twenty years, Lockheed: made presentations to employees; met with the U.S. Government; produced numerous memoranda, position papers, and "Action Items;" and completed industrial hygiene studies regarding its beryllium use. (Civil Action No. 1:04-CV-606-RWS [346], Stmt. Mat. Facts at paras. 8-11, 13, 15-34, 38, 40, 43). Lockheed issued more than forty beryllium "Hazard Analysis Assessments" and spent more than 300 to 400 hours investigating beryllium effects for its F/A-22 production alone. Id. at 27; Civil Action No. 1:04-CV-606-RWS [392] Ex. 2 at 22:2-13.

In December 2001, beryllium dust was first found in Lockheed's Marietta facility. (Civil Action No. 1:04-CV-606-RWS [392] Ex. 2 at 207:9-208:8, Dep.

Rosett).  However, Lockheed's health and safety department was not told about

it until some months later.  Id.  Upon learning of the exposure, Lockheed

ordered its own industrial hygiene tests as well as outside testing to determine

its exposure.  Id. at 210:16-211:21. The outside industrial hygienists determined

that of the air samples taken, none had beryllium exposures above the OSHA-

accepted guidelines or even measurable beryllium quantities. (Civil Action No.

1:04-CV-606-RWS [392] Ex. 1 at 142:6-145:12).  However, they did note that

inhalation could not be completely ruled out if dust was produced.  Lockheed

then instituted more stringent protections including Lockheed-provided apparel

and changing rooms for those who worked in the area. Id. at  226:21-227:1.

B. Current Suit

The Plaintiffs claim to have been exposed to beryllium at various

times and locations over a span of over forty years at Lockheed's Marietta

facility.  Plaintiffs allege that Defendants failed to provide Lockheed with

sufficient and accurate warnings pertaining to the beryllium contained in the

manufactured products.  Specifically, Plaintiffs assert a failure to warn claim,

arguing that the warning materials that the Defendants provided did not

6

adequately communicate the severe health risks associated with the use of beryllium nor did they describe the methods that would reduce such risks.

Each Defendant is alleged to have manufactured component parts using copper-beryllium or aluminum-beryllium alloys for Lockheed. The production of such aircraft parts and assemblies was manufactured according to Lockheed and U.S. Air Force design and specifications. Defendants now seek a favorable judgment on the failure to warn claim, the motion to exclude Dr. John Martyny's testimony, and the motions to compel production.

Following briefing on motions before the Court, the Court ordered a Daubert hearing to clarify the evidentiary and factual background for Plaintiffs' expert witness's opinion and an evidentiary hearing regarding the motions to compel and summary judgment. (Order, Civil Action No. 1:04-CV-606-RWS [414] and Civil Action No. 1:08-CV-2725-RWS [217]). The Daubert hearing was held and Defendant Alcoa offered Dr. Raymond D. Harbison to opine on the findings of Plaintiffs' expert, Dr. James Martyny.

## II.     Motions to Exclude Testimony of Dr. John Martyny

Defendants seek to exclude testimony from Plaintiffs' expert, Dr. John W. Martyny on the basis that his reports lack evidentiary basis, sufficient facts,

7

or reliable scientific methodology under Rule 702. (See Civil Action No. 1:04-CV-606-RWS [352, 358] and Civil Action No. 1:08-CV-2725-RWS [153, 161]).

### A. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of proposed expert evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The trial court, as the gate-keeper, must determine that the testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Daubert v. Merrell Dow Pharm., 509 U.S. 579, 591 (1993) (quoting United States v . Downing , 753 F.2d 1224, 1242 (3d Cir. 1985)). The trial court must also "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. Ltd. v. Carmichel, 526 U.S . 137, 152 (1999). The Eleventh Circuit has synthesized the existing rules into a three-part

AO 72A
(Rev.8/82)

inquiry, instructing courts to consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 562 (11th Cir. 1998), reh'g and reh'g en banc denied, 172 F.3d 884 (1999).

With respect to the reliability of expert testimony, relevant factors include "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." U.S. v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (quoting Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003)). "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." Id.  It is important to note that "expert testimony that

9

does not meet all or most of the <u>Daubert</u> factors may sometimes be admissible."

<u>U.S. v. Brown</u>, 415 F.3d 1257, 1268 (11th Cir. 2005).

Since beryllium is generally recognized in the medical community to

cause the "type of harm plaintiffs allege"–beryllium-related sickness–the

<u>Daubert</u> analysis here focuses on individual causation to the Plaintiffs.  <u>See</u>

<u>McClain v. Metabolife Int'l Inc.</u>, 401 F.3d 1233, 1239 (11th Cir. 2005) (noting

that when "the medical community generally recognizes the toxicity of the drug

or chemical in issue . . .[t]he battleground . . . focuses on plaintiff-specific

questions: was plaintiff exposed to the toxin, was plaintiff exposed to enough of

the toxin to cause the alleged injury, and did the toxin in fact cause the injury?

A <u>Daubert</u> analysis in [these] case[s] deals with questions of individual causation

to the plaintiff.").   The Eleventh Circuit has recognized that in order to "carry

[this causation] burden in a toxic tort case, 'a plaintiff must demonstrate the

levels of exposure that are hazardous to human beings as well as the plaintiff's

*actual* level of exposure to the defendant's toxic substances before he or she may

recover.'" <u>Id.</u> at 1241 <u>quoting</u> <u>Wright v. Willamette Indus., Inc.</u>, 91 F.3d 1105,

1106 (8th Cir. 1996) (emphasis added).  And, as to toxic tort expert reliability,

"the link between an expert's opinion and the dose relationship is a key element"

although "[s]ome ambiguity about individual responses is expected." Id. at 1241 n.6.

B. Discussion

Defendants first contend that Dr. Martyny's expert opinion lacks evidentiary basis, sufficient facts, or reliable scientific methodology to be reliable within the meaning of Rule 702.  This Court agrees.  Even accepting for argument's sake that Defendants' products were actually used by Plaintiffs, Dr. Martyny produced no reliable scientific evidence that such use actually caused the Plaintiffs' injuries.

Dr. Martyny opines that it is "virtually certain" that Plaintiffs "would" have been exposed to beryllium levels greater than the OSHA accepted rate because:

a. The reaming of copper beryllium in an uncontrolled situation *almost always* results in breathing zone exposures that are well above the current OSHA limit of 2.0 $\mu g/m^3$;

AO 72A
(Rev.8/82)

b.  Fatigue testing the F-22 aircraft in an uncontrolled situation *surely resulted* in breathing zone exposures that are well above the current OSHA limit of 2.0 μg/m$^3$;

c. Visible dust emanating from the reaming and fatigue testing was reported by several employees.  This *as well as assures* an exposure well above the current OSHA limit.

(Civil Action No. 1:04-CV-606-RWS [358] Ex. 8, para. 68 (emphasis added)). However, Dr. Martyny's opinion is purely hypothetical; it has not been tested.

The "hallmark of the science of toxic torts [is] the dose-response relationship." McClain, 401 F.3d at 1240. "Exposure is only the opportunity for contact.  Dose is what enters the body." (Civil Action No. 1:04-CV-606-RWS [352] Ex. L at 3). While Dr. Marytny indicated based on his experience and anecdotal evidence that Plaintiffs may have been exposed to beryllium generally, he does not indicate the level, frequency, duration or particle size of this exposure which would indicate the dose from these Defendants' products.  Dr. Martyny himself noted that "[c]urrent information regarding the relative risk of beryllium particulate exposure to cause [Chronic Beryllium Disease ("CBD")]

12

may depend more on particle size and chemical composition than total mass of beryllium exposure." (Civil Action No. 1:04-CV-606-RWS [358] Ex. 8, para. 62).  However, no testing was done of Defendants' products to demonstrate that a bioavailable beryllium particle was even produced by their products or is even procurable at all.[2]

Dr. Martyny, in his Supplemental Report, stated that dose does not play the same role with CBD as it does with other diseases. Civil Action No. 1:04-CV-606-RWS [339] Ex. 1 at 4.  He opined, "[a]lthough individuals with a high dose are more likely to become sensitized and develop disease, some individuals with very low airborne exposures will also develop sensitization and disease due to their genetic make-up, skin exposure, or other individual characteristics." Id. However, Dr. Martyny pointed to no empirical evidence that any of these Plaintiffs had "one copy of the HLA-DPBI allele with glutamic acid at position 69 of the Beta chain" which correlates with increased sensitivity to beryllium.

---

[2]Dr. Martyny responded to this issue by stating "[i]t would seem reasonable that Alcoa would have tested its products prior to this time and would have a great deal of information regarding expected exposures associated with the use of its products."  This misstates the burden.  It is not Alcoa's nor any other Defendant's responsibility to disprove exposure; rather, it is Plaintiffs' burden to prove *actual* exposure. McClain, 401 F.3d at 1241. By not establishing that  Defendants' products produced bioavailable beryllium here, Plaintiffs' claims must fail.

<u>Id.</u>  But most importantly, Dr. Marytny did not produce any evidence that even a low-dose exposure resulted from Defendants' products.  In fact, Dr. Martyny himself admitted that he could not opine as to the individual product or products that were the source of the exposure. Civil Action No. 1:04-CV-606-RWS [392] Ex. 4 at 662:24-663:17, 682:7-689:9.  His opinion is not independently verifiable.

Additionally, Dr. Martyny's methodology does not meet the reliability factors put forth by the Eleventh Circuit.  First, Dr. Martyny's theory has not been appropriately tested.  Dr. Martyny stated that "only industrial hygiene sampling for a period of time can document the actual exposure." Civil Action No. 1:04-CV-606-RWS [358] Ex. 8 at para. 18.  Admittedly, this would be more difficult now because Lockheed has implemented various controls that were not in place during the initial operation. Civil Action No. 1:04-CV-606-RWS [339] Ex. 1 at 3.  However, sampling did occur after "the incident"[3] was reported.[4]

_____

[3]The "incident" occurred in December 2001 when beryllium dust was first found in the B-4 building (where the F/A-22 fatigue testing occurred). (<u>See</u> Civil Action No. 1:04-CV-606-RWS [392] Ex. 2 at 207:9-208:8).

[4]There is also evidence that sampling had occurred in the eighties and nineties but those sampling reports cannot be found in the record. (<u>See</u> Civil Action No. 1:04-CV-606-RWS [392] Ex. 2 at 244).

14

(Civil Action No. 1:04-CV-606-RWS [392] Ex. 2 at 211). Even then, thirty-eight samples were taken and every air sample "indicated that airborne beryllium concentrations were below the analytical reporting limit (<0.001 μg/sample) and less than the OSHA PEL for beryllium." (Civil Action No. 1:04-CV-606-RWS [392] Ex. 54 at 12).

Dr. Harbison, Defendant Alcoa's expert, did suggest that there were other methods to determine levels of exposure to Defendants' products. For instance, at oral argument Dr. Harbison confirmed that Defendants' products could have been placed in an environmental chamber and the various machining procedures could have been reenacted to determine the particle production and size. While clearly this would not be as conclusive as personal sampling data for each Plaintiff, this evidence would at least minimally indicate that bioavailable beryllium from Defendants' products was possible. Additionally, Dr. Martyny himself noted that reconstruction was an option, albeit an expensive one. Civil Action No. 1:04-CV-606-RWS [339] Ex. 1 at 2.

Further, Dr. Martyny's theory has neither been subjected to peer review nor does it have a known or potential rate of error. As Dr. Martyny himself

15

noted, "[n]o published studies have been conducted to document levels of beryllium released by workers working with beryllium-aluminum in the aircraft industry." (Civil Action No. 1:04-CV-606-RWS [339] Ex. 1 at 3).  There is no objective data to analyze, so there can be no known rate of error.  Lastly, this technique is not generally accepted in the scientific community. (Civil Action No. 1:04-CV-606-RWS [352] Ex. L at 10).  In fact, there was no actual testing of Dr. Martyny's hypothesis.  In sum, this technique does not meet the reliability requirement of <u>Daubert</u> nor prove Plaintiffs' actual exposure to Defendants' products.

Additionally, because there was no empirical evidence produced by Dr. Martyny, his testimony would not meet the third <u>Daubert</u> prong: assistance to the trier of fact.  Dr. Martyny's opinion begs the question rather than offering scientific explanation.  His opinion assumes that Plaintiffs' injuries must have been caused by Defendants' products because the Defendants produced beryllium parts which were sold to Lockheed.  However, nothing in his opinion links these products to the Plaintiffs nor rules out other manufacturers' products that were also present at the Marietta facility.  This type of reasoning would not aid the trier of fact. Therefore, for all the foregoing reasons, Defendants'

Motions to Exclude are **GRANTED.** (Civil Action No. 1:04-CV-606-RWS [352, 358] and Civil Action No. 1:08-CV-2725-RWS [153, 161]).

**III. Motions for Summary Judgment**

      A.      <u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the

pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

Defendants seek summary judgment on a number of grounds.[5]  The Court addresses herein Defendants' contentions that Plaintiffs failed to show that their injuries were proximately caused by exposure to the product of any specific Defendant and that Lockheed was a sophisticated user who did not require warning.  Because the Court finds that Defendants are entitled to summary judgment on both of these grounds, the Court has not addressed the additional grounds asserted by Defendants and makes no ruling regarding those grounds.

B.    Causation

Defendants contend that Plaintiffs fail to demonstrate that they were directly exposed to a particular Defendants' product at ascertained times and that such exposure was the proximate cause of the alleged injury. (See Civil Action No. 1:04-CV-606-RWS [347] and Civil Action No. 1:08-CV-2725-RWS [149] at 1.)  Causation requires proof that a plaintiff worked directly with a defendant's products or in close proximity to others who did. Blackston v. Shook & Fletcher Insulation Co., 764 F.2d 1480, 1482 (11th Cir. 1985).  More than a possibility of a causal relationship is required – a plaintiff must show the

---

[5]Defendant McCann's Motion for Leave to File Excess Pages (Civil Action No. 1:08-CV-2725-RWS [160]) is granted, nunc pro tunc to April 1, 2010.

"*probability* of exposure as a cause." <u>MacZko v. Employers Mut. Liability Ins. Co.</u>, 157 Ga. App. 247, 250 (1967) (emphasis in original).

In order to show this probability of exposure, Georgia "generally requires reliable expert testimony which is 'based, at the least, on the determination that there was a *reasonable probability* that the negligence caused the injury.  In the alternative, expert testimony stated only in terms of a 'possible' cause *may* be sufficient if it is supplemented by probative non-expert testimony on causation." <u>Wilson v. Taser Int'l Inc.</u>, 303 Fed. Appx. 708, 715 (11th Cir. 2008) (internal citations omitted).  If expert testimony is required but not provided, no genuine issue of material fact exists on the causation element of the claim and a grant of summary judgment is proper. <u>Id.</u> at 715-16.

Here, Plaintiffs' only expert is excluded as unreliable.  Therefore, Plaintiffs retain no expert to opine under either the "probable" or "possible" routes to causation.  Further, this is not a case which could be informed by the juror's human experience alone to prove causation.  <u>See McDaniel v. Employers Mut. Liab. Ins. Co.</u>, 121 S.E.2d 801, 804-05 (Ga. Ct. App. 1961).  Rather, as seen above,  this is a complex toxic tort case in which Plaintiffs must prove the

actual level of beryllium exposure which caused their harm.  See McClain, 401 F.3d at 1241 ("to carry the burden in a toxic tort case, a plaintiff must demonstrate the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover."). Therefore, Plaintiffs' lack of expert testimony is fatal to the causation element of their failure to warn claim and Defendants' motion for summary judgment is **GRANTED**.  (Civil Action No. 1:04-CV-606-RWS [346] and Civil Action No. 1:08-CV-2725-RWS [148]).

### C. No Duty Because Lockheed is a Sophisticated User

Defendants also claim that any failure to warn claim should be barred because Lockheed was a sophisticated user of copper-beryllium and aluminum-beryllium alloys.  (See Civil Action No. 1:04-CV-606-RWS [346] at 3 and Civil Action No. 1:08-CV-2725-RWS [148] at 3).  For Plaintiffs to prevail on their failure to warn claim, they must demonstrate that "the [D]efendant[s] had a duty to warn, . . .breached that duty, and the breach was the proximate cause of plaintiff's injury." Powell Duffryn Terminals, Inc. v. Calgon Carbon Corp., F. Supp. 2d 1198, 1203 (S.D. Ga. 1998) aff'd 176 F.3d 494 (11th Cir. 1999).  The existence of that duty to warn "depends on the foreseeability of the [danger], the

type of danger involved, and the foreseeability of the user's knowledge of the danger." <u>Niles v. Bd. of Reagents</u>, 473 S.E.2d 173, 175 (Ga. Ct. App. 1996) <u>citing</u> <u>Exxon Corp. v. Jones</u>, 433 S.E.2d 350 (Ga. Ct. App. 1993). However, no such duty is owed when the user of the product "should know of the danger, or should in using the product discover the danger." <u>Whirlpool Corp. v. Hurlbut</u>, 303 S.E.2d 284, 288 (1983). The user's knowledge should be viewed from "an objective point of view, as opposed to subjective, since the user's perceptions are irrelevant." <u>Morris v. Clark Equip. Co.</u>, 904 F. Supp. 1379, 1383 (M.D. Ga. 1995).

Most importantly, the user's knowledge does not need to encompass the "precise, physical nature of the hazard presented by his 'use' of the product; it is sufficient if he is aware generally that the 'use' being made of the product is dangerous." <u>Whirlpool</u>, 303 S.E.2d at 288. "Ordinarily, there is no duty to give warning to the members of a profession against generally known risks. 'There need be no warning to one in a particular trade or profession against a danger generally known to that trade or profession.'" <u>Niles</u>, 473 S.E.2d at 175 (<u>citing</u> <u>Eyster v. Borg-Warner Corp.</u>, 206 S.E.2d 668, 670 (1984).

22

Further, in <u>Argo v. Perfection Prods. Co.</u>, 730 F. Supp. 1109, 1118-19 (N.D. Ga. 1989) <u>aff'd</u> 935 F.2d 1295 (11th Cir. 1991), this Court noted that if a sophisticated user's employees have knowledge that a particular risk of harm exists and yet allow the harm to occur, this knowledge may bar other employees' claims against the product manufacturer. There, supervising employees were aware (due to their sophistication) that taping down safety buttons was hazardous and yet allowed the process to continue. <u>Id.</u> at 1113. The Court ruled that the supervising employees' knowledge–thus the knowledge of the sophisticated user–barred other employee's claims against the product manufacturer. <u>Id.</u> at 1118-19.

Here, Lockheed is a sophisticated user of beryllium alloys. For more than forty years, Lockheed has used the Department of Defense's "Handbook for Metallic Materials and Elements for Aerospace Vehicle Structures" which provides guidelines for beryllium use. (Civil Action No. 1:04-CV-606-RWS [64], Ex. G, Decl. of Anthony L. Green). Further, in 1983 Lockheed issued its own "Safety and Industrial Hygiene Standard No. 3.5" which recognized that beryllium dust and vapors cause respiratory problems. (Civil Action No. 1:04-CV-606-RWS [346] Ex. 3, Bosserman Ex. 15). This report confirmed that air

23

sampling was the best way to monitor beryllium[6] and that "machining, grinding, polishing, sanding, chemical etching, chem-milling, arc welding, electro chemical machining, spark sintering, and any heating above 1500 [degrees] Fahrenheit" are "operations involving beryllium which are capable of producing airborne concentrations of dust, mists, or fumes in excess of [allowable] limits." Id. at 4.1.  Additionally, in Exhibit D of that report, Lockheed recognized that it should order "medical monitoring" for those within the exposed worker population. Id.

Plantiffs' own expert noted that Lockheed, as a part of the beryllium industry, had as much access to information regarding beryllium safety as anyone else. (Civil Action No. 1:04-CV-606-RWS [392] Ex. 4 at 414:15-415:10).  Lockheed would issue task-specific warnings to employees with potential beryllium exposures. (Civil Action No. 1:04-CV-606-RWS [392] Ex. 1 at 24:13-25:15). Further, Lockheed's senior staff industrial toxicologist–Dr. Pamela Rosett—testified that Lockheed's goal "was to not have any [beryllium] exposure" and they took steps to meet that goal. (Civil Action No. 1:04-CV-606-

---

[6]As seen above, Lockheed apparently did sampling in the 1980s and 1990s which could not be found in the record.

RWS [392] Ex. 3 at 140:5-6, Dep. Rosett).  Ms.Lisa Bosserman–Lockheed's industrial hygienist and manager of its Environmental, Safety, and Health Department–stated that it was Lockheed's policy not to give "particular weight to what a vendor says or what's on the [material safety data sheets]." (Civil Action No. 1:04-CV-606-RWS [392] Ex. 1at 203:7-24).  Lockheed performed its own risk analysis, incorporating vendor warnings with its own research and knowledge about its beryllium-producing activities.  (Civil Action No. 1:04-CV-606-RWS [346], Stmt. Mat. Facts at para. 42).

Ultimately, like the Plaintiffs in <u>Argo</u>, Lockheed's employees knew the risks associated with beryllium.  They knew machining, grinding, sanding, etc. produced possible beryllium exposures and knew how to guard against them. This conclusion is supported by the fact that once Lockheed management discovered that dust was being produced in the F/A-22 fatigue testing, industrial hygienists were called to do additional sampling. (Civil Action No. 1:04-CV-606-RWS [392] Ex. 2 at 207:9-208:8). Additionally, Lockheed was a long-time member of the beryllium industry who had used these offending products on a daily basis.  In fact, Lockheed had a full-time department replete with an industrial hygienist and toxicologist who was tasked with monitoring beryllium

25

exposure issues.  Therefore, Lockheed knew that beryllium dust was harmful to its employees yet allowed it to occur.

Not only did Lockheed generally know the risks as required by <u>Whirpool</u>, it knew the risks better than the Defendants because Lockheed knew what operations were performed on Defendants' products. (Civil Action No. 1:04-CV-606-RWS [392] Ex. 1 at 204:17-205:8.  Lockheed was a sophisticated user; therefore, Defendants' motion for summary judgment is **GRANTED**.(Civil Action No. 1:04-CV-606-RWS [346] and Civil Action No. 1:08-CV-2725-RWS [148]).

### III. Motions to Compel Non-Party Lockheed and Defendant McCann

Plaintiffs seek to compel Non-Party Lockheed and Defendant McCann to produce detail prints, operations cards, and assembly prints.  (<u>See</u> Civil Action No. 04-cv-0606-RWS [314], [319]).  At the September 2 hearing, the Court directed Lockheed to take appropriate steps to produce the requested documents. However, because Plaintiffs' claims have been resolved by summary judgment, the requested production is no longer required.  Therefore, Plaintiffs' motions

are **DENIED as moot.** (Civil Action No. 1:04-CV-606-RWS [319] and Civil

Action No. 1:08-CV-2725-RWS [125]).

### Conclusion

Based on the foregoing, the following motions are **GRANTED:**

Defendants' Motions for Summary Judgment (Civil Action No. 1:04-CV-606-

RWS [345, 346, 347, 356, & 360] and Civil Action No. 1:08-CV-2725-RWS

[147,148, 149, 156, & 159]); Defendants' Motions to Exclude Testimony (Civil

Action No. 1:04-CV-606-RWS [352, 358] and Civil Action No. 1:08-CV-2725-

RWS [153, 161]); and Defendant McCann's Motion for Leave to File Excess

Pages (Civil Action No. 1:08-CV-2725-RWS [160]), which is granted, nunc pro

tunc to April 1, 2010.

Plaintiffs' Amended Motion to Compel Production of Documents from

Lockheed Martin (Civil Action No. 1:04-CV-606-RWS [314]) and Plaintiffs'

Motion to Compel Production of Documents by McCann (Civil Action No.

1:04-CV-606-RWS [319] and Civil Action No. 1:08-CV-2725-RWS [125]) are

**DENIED as moot.**

27

**SO ORDERED**, this   17th   day of September, 2010.


_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE